SECURITIES AND EXCHANGE
COMMISSION

v.

**John G. BENNETT, Jr., and
the Foundation for New
Era Philanthropy.**

No. 95–3005.

United States District Court,
E.D. Pennsylvania.

June 12, 1995.

David S. Horowitz, S.E.C., Philadelphia, PA, Richard H. Walker, Ellen N. Hersh, Jacqueline Abramson Zucker, Petra T. Tasheff, Alexander M. Vasilescu, S.E.C. New York City, for plaintiff.

Gregory P. Miller, Miller, Alfano & Raspanti, P.C., Odell Guyton, Gino J. Benedetti, Philadelphia, PA, for defendant.

## MEMORANDUM ORDER

ANITA B. BRODY, District Judge.

Pursuant to the authority granted it under section 20(b) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77t(b), and section 21(d)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u(d)(1), plaintiff Securities and Exchange Commission ("SEC") seeks the entry of a negotiated consent order granting a preliminary injunction against defendant John G. Bennett, Jr. The principal question before me is whether I have subject matter jurisdiction over this action. For the reasons set forth below, I conclude that I do. Accordingly, because Mr. Bennett has consented to the terms of the proposed preliminary injunction and because I defer to the SEC's judgment in negotiating those terms, I now enter that injunction as an order.

## I. BACKGROUND

■ On May 18, 1995, the SEC filed its complaint in this action, alleging that defendants had engaged in a massive Ponzi scheme to defraud various individuals and nonprofit organizations by means of a sham "matching" gift program financed by fictitious "anonymous benefactors." The same day, the SEC petitioned for entry of the proposed consent injunction under consideration now.[1] I held a conference on the record in open court that evening to discuss my concerns with the proposed injunction. Those concerns centered on the issue of my subject matter jurisdiction, specifically, whether the instruments involved here were "securities" within the meaning of those laws. I made a provisional finding of jurisdiction and directed that the jurisdictional issue be briefed by May 31, 1995. Then, after setting a date for a preliminary injunction hearing, I entered the proposed consent injunction as a temporary restraining order. In issuing these rulings, I acted pursuant to the long line of authority originating with *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947), which recognizes the traditional power of a court to "exercise jurisdiction to determine its jurisdiction" and to make related rulings necessary to preserve the *status quo* until a final determination of jurisdiction.

The SEC has now responded to my jurisdictional concerns with a thorough brief and with substantial factual affidavits that are supported by extensive exhibits. The SEC's submissions, together with the allegations in its complaint, allay any doubts about my jurisdiction in this case. Accordingly, I find

---

1. The terms of the proposed preliminary injunction would: (i) freeze the assets Mr. Bennett owns or controls (other than those assets of co-defendant Foundation for New Era Philanthropy); (ii) require Mr. Bennett to update by September 5, 1995, the previously ordered accounting of his assets so as to enable the SEC to effect such a freeze; and (iii) restrain future violations by Mr. Bennett of sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

As originally submitted, the proposed consent injunction also provided for an agreed amount for Mr. Bennett's living expenses and for Mr. Bennett's reasonable attorney's fees, both of which were exempted from the asset freeze. But during a June 6, 1995, telephone conference held on the record with counsel, I indicated that I might not approve as reasonable the agreed sum for living expenses, and asked if Mr. Bennett's consent to the injunction would be affected by such a ruling. Tr. of June 6, 1995, Conference at 3–5. In response, counsel for both the SEC and Mr. Bennett agreed to sever from the proposed injunction the living expense and attorney's fee provisions and to petition the Court separately on those matters. Additionally, Mr. Bennett's counsel reiterated their consent to the injunction's remaining terms. *Id.* at 14. Accordingly, I treat the proposed consent injunction before me as devoid of living expenses and attorney's fee provisions, and I address in this Memorandum Order only the balance of that proposal.

that I have subject matter jurisdiction over this action. That finding empowers me to proceed to the proposed preliminary injunction, which I now enter as an order because Mr. Bennett has consented to its terms and because the injunction is not unfair or otherwise unreasonable.[2]

## II. DISCUSSION

### A. Subject Matter Jurisdiction

■■■ Both the Securities Act and the Exchange Act confer upon a district court subject matter jurisdiction over actions to enforce liabilities or duties created by those statutes or by rules and regulations promulgated under those statutes. 15 U.S.C. § 77v(a); 15 U.S.C. § 78aa. Because these statutes govern not general business fraud but only the issuance and trading of "securities," jurisdiction under the securities laws will not lie unless the transactions at issue involve an instrument that qualifies for the label "security." Whether the interest at issue meets the definition of "security," then, "is both a question of subject matter jurisdiction and an element of" the substantive claim under the securities laws. *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 239 (4th Cir.1988) (Powell, J.).

■■■ Where, as here, an element of the substantive federal claim goes also to the court's subject matter jurisdiction, the jurisdictional inquiry is distinguished from the counterpart merits determination by application of a more deferential standard. Unlike a merits determination, the jurisdictional inquiry in a federal question case asks not whether the "legal theory alleged is probably false," but only whether "the right claimed is so insubstantial, implausible, foreclosed by

prior [court decisions] or otherwise completely devoid of merit as not to involve a federal controversy." *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 899 (3d Cir. 1987) (internal quotations omitted) (citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974) and *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)).

■■■ But the degree of judicial deference envisioned in *Kulick*'s "wholly insubstantial" jurisdictional standard is premised upon the assumption that at some point before the court is called upon to adjudicate substantial rights or responsibilities, the parties will contest the merits of the claims alleged. *See Bell*, 327 U.S. at 682, 66 S.Ct. at 776; *Kulick*, 816 F.2d at 898. *See also Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1281 n. 5 (3d Cir.1993) (observing that court retains ability to "examine facts in determining jurisdiction" so long as it does not disregard deferential jurisdictional standard of cases such as *Bell* and *Kulick*). In the usual preliminary injunction scenario, for example, a district court confronted with a dual jurisdictional-substantive allegation can, at the jurisdictional stage, brush aside all but the most glaring questions about the viability of that allegation, confident that the point will be debated by motivated adversaries when the propriety of the injunction's issuance is taken up.

Here, the adversary machinery is not functioning, for Mr. Bennett, advised by counsel, has consented to the terms of the proposed injunction. As a result, I find myself being asked to approve equitable relief without ever being given the comfort of a contested (if preliminary) exchange on the merits of the

**2.** Of course, the jurisdictional analysis is not affected by the nonprofit character of the organization issuing the instruments involved in this case. While the securities of a nonprofit organization may be exempted from registration under the Securities Act and the Exchange Act, *see* 15 U.S.C. §§ 77c(a)(4) & 78*l* (g)(2)(D), the antifraud provisions of both statutes remain fully applicable. *See* 15 U.S.C. § 77q(c) (§ 17 of the Securities Act applicable to securities exempt from registration); *Forman v. Community Servs., Inc.*, 366 F.Supp. 1117, 1132 n. 44 (S.D.N.Y.1973) (antifraud provisions of both Securities Act and Exchange Act applicable to securities exempt from registration), *rev'd on other grounds*, 500 F.2d

1246 (2d Cir.1974), *rev'd sub nom. United Housing Found., Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). *See generally* III Louis Loss & Joel Seligman, *Securities Regulation* 1144 (3d ed. 1989) (discussing application of fraud provisions in cases involving exempt securities). Moreover, even the registration exemption itself will not be assumed; it must be affirmatively pleaded and proved by the defendant. III Louis Loss & Joel Seligman, *Securities Regulation* 1145–49 (3d ed. 1989). Consequently, both the antifraud and registration provisions invoked in the SEC's complaint are, at this point, fully in play.

SEC's threshold jurisdictional allegation: that Mr. Bennett and co-defendant Foundation for New Era Philanthropy ("New Era") engaged in transactions involving a "security." I therefore deem it appropriate to subject the bare jurisdictional allegations in the complaint to slightly more rigorous scrutiny than would otherwise be appropriate, and to require that they be corroborated by affidavit testimony or exhibits submitted by the

SEC. After reviewing the SEC's affidavits and exhibits, I conclude that the SEC's characterization of the interests at issue here as "securities" surpasses the "wholly insubstantial" standard set forth above.[3]

## B. *Preliminary Injunction*

■ Having found subject matter jurisdiction here, I turn to the proposed consent

---

**3.** The term "security" includes "notes," "investment contracts," and "other evidence of indebtedness." 15 U.S.C. § 77b(1); 15 U.S.C. § 78c(a)(10). The SEC contends that the interests issued here by Mr. Bennett and New Era qualify for each of these categories. While I of course intimate no view on this contention for substantive merits purposes, I agree with the SEC that it is more than adequate as a basis for jurisdiction here.

a. "Notes"

To be a "note" within the meaning of the securities laws, an instrument must meet both the legal definition of a "note" and that of a "security." The record here discloses several types of instruments executed by New Era that might credibly be described as "notes" in the generic legal sense, in that they contain a promise to pay a specific payee a sum certain on a date certain. *See* Black's Law Dictionary 956 (5th ed. 1979) (defining "note"). These include a form letter agreement attached to New Era's offering memoranda (Compl. ¶¶ 8, 13–16; Shaffran Aff. ¶ 12; Ex. 1 to Shaffran Aff.) and items of initial and confirming correspondence sent to various institutions in anticipation or upon receipt of the institution's funds (Compl. ¶¶ 8, 13–16; Shaffran Aff. ¶¶ 18–20, 21–23; Exs. 3–7, 10–14 to Shaffran Aff.).

Because all "notes" do not necessarily qualify for the narrower label "securities," however, a further showing that these instruments meet the "securities" standard is necessary. Thus, the SEC asserts that these instruments also satisfy the criteria to be considered "securities" under the framework set out in *Reves v. Ernst & Young*, 494 U.S. 56, 63–67, 110 S.Ct. 945, 950–52, 108 L.Ed.2d 47 (1990). In this regard, the SEC observes that these notes do not appear on *Reves*'s list of previously determined "non-securities." Moreover, the SEC submits support for its claim that these instruments bear no "family resemblance" to any such "non-security" when tested against the four relevant factors articulated in *Reves*. First, the SEC submits that New Era's purpose in issuing the "notes" was to finance itself and that the various participants' purpose was to profit from the 100% return assured by the notes. (Compl. ¶ 14; Shaffran Aff. ¶ 16; Exs. 1, 2, 4 to Shaffran Aff.; Exs. B, D to Newman Aff.). Second, the SEC submits that the plan of distribution here was like that of a "security" because hundreds of individuals and institutions in the United States were solicited by

New Era and because over three hundred investors actually participated in New Era's "matching" program. (Compl. ¶¶ 7, 13; Shaffran Aff. ¶¶ 31, 38; Exs. 21–22, 25 to Shaffran Aff.). Third, the SEC submits that the public could reasonably expect that these notes were "securities" because New Era described them as an "investment" and because participants were told their funds were being placed at the well-known brokerage firm of Prudential Securities, Inc. (Compl. ¶¶ 20–23; Shaffran Aff. ¶¶ 10, 11, 21, 24–29; Exs. 1–2, 7–8, 15–19 to Shaffran Aff.). Finally, the SEC points out that there is no alternative regulatory regime that significantly reduces the risk of New Era's "matching" program and that renders application of the securities laws unnecessary here.

These supported allegations are more than sufficient to assert a colorable claim that the instruments offered here were "notes" within the meaning of the securities laws.

b. "Investment Contracts"

The interests here might also qualify as "investment contracts" under the three-pronged test of *Securities & Exchange Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). In support of this claim, the SEC submits the following: participating institutions and individuals placed funds or securities with New Era and thus "invested" money (Compl. ¶¶ 13, 19; Shaffran Aff. ¶¶ 19–21; Exs. 4, 5, 7 to Shaffran Aff.); the invested funds or securities were pooled for a common purpose, which would satisfy the "common enterprise" prong (Compl. ¶¶ 8, 27; Shaffran Aff. ¶¶ 8–15; Exs. 1, 2 to Shaffran Aff.); and the "matching" gift representing the profit was procured through "the efforts of others," namely, the brokering skills and fund-raising efforts of Mr. Bennett and New Era (Compl. ¶¶ 14, 16, 19; Shaffran Aff. ¶¶ 12–13; Exs. 1, 2 to Shaffran Aff.).

c. "Other Evidence of Indebtedness"

Finally, the note-like instruments mentioned above may also constitute "other evidence of indebtedness" under the securities laws when judged by the criteria developed in the "notes" context. *See* II Louis Loss & Joel Seligman, *Securities Regulation* 900 (3d ed. 1989) (applying criteria for determining whether notes are "securities" to "other evidence of indebtedness"). Thus, the SEC could conceivably bring these instruments within the scope of "other evidence of indebtedness" even if it were determined that they did not meet the narrow definition of notes.

injunction. Federal policy strongly favors the use of consent injunctions as a means of achieving efficiency in securities law enforcement. *See, e.g.,* X Louis Loss & Joel Seligman, *Securities Regulation* 4681 & n. 52 (3d ed. 1993) (noting wide use of consent injunctions); Thomas L. Hazen, *Administrative Enforcement: An Evaluation of the Securities and Exchange Commission's Use of Injunctions and Other Enforcement Methods,* 31 Hastings L.J. 427, 450–51 (discussing potential efficiencies to be derived from use of consent injunctions). The Supreme Court, moreover, "has long endorsed the propriety of the use and entry of consent judgments." *Securities & Exchange Comm'n v. Randolph,* 736 F.2d 525, 527 (9th Cir.1984) (collecting Supreme Court cases). In reviewing this proposed consent injunction, I am to pay substantial deference to the SEC's judgment in negotiating it, *Randolph,* 736 F.2d at 529, and I am to reject it only if it is "unfair, inadequate, or unreasonable." *Id.*

The proposed consent injunction should be approved. It is not unfair or unreasonable on its face, and it is evidently the product of substantial negotiation between Mr. Bennett and the SEC. Moreover, Mr. Bennett's counsel represented at the May 18, 1995, conference that they had reviewed it carefully with Mr. Bennett and had advised him to sign it. Accordingly, I approve and adopt the proposed consent injunction, and I enter it as a preliminary injunction ordered by the Court.

### III. CONCLUSION

Based on the SEC's complaint and supporting submissions, I find that the characterization of the interests at issue here as "securities" surpasses *Kulick*'s "wholly insubstantial" standard, and I therefore find that I have subject matter jurisdiction over this action. Furthermore, I approve and enter as an order of the Court the proposed consent preliminary injunction.

**IT IS SO ORDERED.**