BRIGHT, Circuit Judge,
dissenting.
This case has been in litigation for fifteen years. In 1989, the district court rejected the Tribe’s claims on the merits, ruling that the government had paid for the lakebed. Devils Lake I, 714 F.Supp. 1019 (D.N.D.1989). We reversed, ruling that summary judgment was inappropriate since, as we stated, “The facts of the instant case suggest that the parties may have deliberately excluded the lakebed from the 1977 settlement because they considered it part of the Reservation. Admitting such a possibility, it would be counterintuitive to conclude as a matter of law that the parties intended the 1977 settlement to prevent the Tribe from asserting a subsequent claim to the lakebed.” Devils Lake II, 917 F.2d 1049, 1056 (8th Cir.1990). The opinions in Devils Lake I and Devils Lake II assumed jurisdiction rested with the court to decide the merits.
Since that time, the parties negotiated but have failed to reach a settlement. Now, after fifteen years, the majority, in effect, states that there is no decision here, and the title of the Devils Lake lakebed remains in limbo. It tells the parties that the federal courts will not decide the title dispute. To me, it is analogous to two boxers who have fought for fifteen rounds only to hear the judges say “we decline to decide who wins and we send the fighters to box in another ring.”
I respectfully dissent from the majority’s opinion. The issue is when did the Tribe know or when should it have known that the United States claimed the lakebed of Devils Lake. In my view, the Tribe did not know and would not have known of the government’s adverse claim until 1981, when the official position of the United States changed from its view that the Tribe owned the lakebed to a view of “no definite position” on title to the lakebed.
We commented on the official position of the United States in Devils Lake II, 917 F.2d 1049 (8th Cir.1990). This court determined that in 1976 the Department of the Interior issued an opinion, authored by an Associate Solicitor for Indian Affairs (Reid Peyton Chambers), which concluded that Devils Lake is wholly within the Reservation boundaries and the United States holds title to the lakebed in trust for the Tribe. Id. at 1052-53. The panel noted that the United States asserted this position in subsequent litigation, but ultimately abandoned it. Id. at 1053 n. 6. The panel concluded that the government’s opinion was communicated to the Tribe later in 1976, but, in 1981, the government withdrew support from its 1976 opinion. Id. at 1054.
Associate Solicitor Chambers’ letter stated as follows:
By Memorandum dated February 13, 1976, you requested my assistance in determining the status of the title to the bed of Devils Lake in North Dakota.... [T]he Attorney General [of North Dakota] also requested an opinion as to the location of the “lakeside boundary” of the Fort Totten Sioux Indian Reservation which, in the Attorney General’s view, is located “on the shore of Devils Lake.”
*749 I am of the opinion that Devils Lake is not adjacent to the Fort Totten Sioux Indian Reservation but wholly within its boundaries and the United States holds title to the lakebed in trust for the Devils Lake Sioux Tribe.
Tribe App. at 74.
Therefore, the conveyance by the State of North Dakota in 1971 was a conveyance of whatever interest the State possessed in the lakebed. The State may have thought it possessed title to the lakebed but title never had been confirmed to the State. The 1971 quitclaim may have been a move to satisfy the paper requirements for the Garrison Diversion Project, but binding the Tribe to it is another question altogether.
Subsequently, in a 1981 letter, the Department of the Interior advised the Land and Natural Resources Division of the Department of Justice on the question of whether the State acquired the bed of West Bay, Devils Lake as an incident of statehood. The Department saw
no need to take a definitive position on the title to the entire lakebed at this time. If and when these issues arise in litigation of interest to the Tribe, they will be fully addressed by this Department. Meanwhile, the June 21, 1976 memorandum of the Associate Solicitor, Indian Affairs, should no longer be relied upon as stating the position of this Department on the ownership of the Lakebed.
Tribe App. at 222.
The State’s 1971 conveyance was not mentioned in the 1981 letter. Obviously, the federal government placed no importance upon this conveyance by North Dakota to the United States as shown by the utter lack of mention of the conveyance in the official correspondence regarding ownership of the lakebed.
In my judgment, upon review of these letters, it is clear the Tribe would not have received a definitive answer from the United States as to ownership of the lakebed if it had asked for direction in 1981. The United States did not know, nor had it determined, ownership of the lakebed. As a result, applying the statute of limitations at this late stage is wrong. In essence, the Tribe did not know and could not know of an adverse claim to the lakebed by the United States, at any time prior to at least 1981 or later.
My position is supported by the cases in the Ninth Circuit, Michel v. United States, 65 F.3d 130 (9th Cir.1995) (per curiam), and Shultz v. Department of Army, 886 F.2d 1157 (9th Cir.1989), which treat analogous situations. The majority cites Michel for the proposition that the governing legal framework for this case is that when the government abandons its interest in land, a new twelve-year period begins in which a plaintiff may file a Quiet Title Act action against the government once the government reasserts an adverse claim. See also Shultz, 886 F.2d at 1161 (“[i]f the government has apparently abandoned any claim it once asserted, and then it reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted.”) However, the majority’s assumption that the United States had property to abandon is misguided. The Tribe’s “treaty or aboriginal title” to the lakebed was conceded for purposes of the United States’ summary judgment motion, and the merits of that issue still have not yet been litigated. The majority does not reach the Tribe’s alternative theory that the Tribe retained aboriginal title to the submerged lands, which cannot be extinguished without explicit action by Congress. Oneida Indian Nation of N.Y. v. County of Oneida, 414 U.S. 661, 667-68, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974).
*750 Applying the Ninth Circuit cases, the Department of Interior’s 1981 letter reasserts a new status of the lakebed because it indicated the status quo for the government’s view of the ownership of the lake-bed had changed from conviction that the Tribe owned it to saying that the government took no definitive position, i.e., it did not know. The statute of limitations should have begun, at the earliest, in 1981 or later. The record does not show prior to the lawsuit why or when the United States claimed ownership of the lakebed. The issue is not abandonment of rights by the government, or whether its 1976 position binds the government, about which the majority engages in mere conjecture as there is simply no testimony in the record to support these assumptions. The government was not giving anything up in its 1981 letter; rather, its position was that it didn’t know. The United States, at no time prior to 1981, made any claim to the lakebed. Indeed, as we have observed, the United States recognized that the Tribe could claim ownership.
I reject a per se rule of nonjusticiability that fails »to consider adequately the Tribe’s history of reliance on the government, as trustee, acting in its interests. Nor would I give credence to the claim that, prior to 1971, the Tribe understood the adverse character of the federal government’s claim to Devils Lake.
An important question, as I see it, is whether there was any reason for the Tribe not to rely on its trust relationship with the federal government, when the State of North Dakota in 1971 quitclaimed more than 62,000 acres of the lake to the United States for the Garrison Diversion Project, and when interpreting the government’s 1976 and 1981 memos regarding the reservation boundaries.[7] Further, it is well-documented that the Tribe historically relied on the federal government to manage day-to-day Reservation affairs, and the Tribe had a right to think that the government was not cheating it out of ownership of the lakebed but would protect the Tribe’s interests.
Where does this leave us? The undisputed facts show the Tribe filed its lawsuit in 1986, within twelve years of the government’s “I don’t know” pronouncement in 1981 that its 1976 memorandum “should no longer be relied upon as stating the position of this Department on the ownership of the lakebed.” Thus, the Tribe’s lawsuit is timely.
Unfortunately, as a result of the majority’s conclusion that the court may properly dismiss the claims against the government for lack of jurisdiction, the ownership of the Devils Lake lakebed remains in limbo. The State of North Dakota, for example, stands on uncertain ground now as to the parts of the lake it did not quitclaim to the United States in 1971, and, in that respect, the district court abused its discretion in dismissing all of the Tribe’s claims against the State because the federal government is not an indispensable party as to all parts.
The majority substitutes a judgment of dismissal, based on conjecture and ambiguity rather than on the merits, in place of this court’s duty to provide the parties *751 their day in court. I respectfully dissent. Justice delayed is justice denied.

. The majority characterizes the dispute concerning ownership of the lakebed as "long-simmering.” To the contrary, I believe we should take judicial notice that ownership of the lakebed was insignificant until recently, when the level of water rose and Devils Lake became vastly more important for its recreational benefits. The majority’s unanchored interpretation of history ignores that all of this territory in what is now North Dakota belonged to native peoples before the arrival of white settlers. The majority implies that the Tribe's ancestors were getting more than they deserved in the 1867 Treaty because they were beneficiaries of the government’s largesse.