ONEIDA INDIAN NATION OF NEW
YORK, et al., Plaintiffs,

v.

STATE OF NEW YORK, et
al., Defendants.

ONEIDA INDIAN NATION OF
WISCONSIN, et al., Plaintiffs,

v.

The STATE OF NEW YORK, et
al., Defendants.

Nos. 78–CV–104, 79–CV–798.

United States District Court,
N.D. New York.

Nov. 19, 1986.
As Amended Dec. 10, 1986.

Native American Rights Fund, Washington, D.C., for plaintiff Oneida Indian Nation of Wisconsin; Arlinda Locklear, Francis Skenadore, Oneida, Wis., of counsel.

Daan Braveman, Gary T. Kelder, Syracuse, N.Y., for plaintiff Oneida of the Thames Band.

Bertram Hirsch, Floral Park, N.Y., for Oneida Indian Nation of New York.

Indian Law Resources Center, Washington, D.C., for plaintiff-intervenors, The Houdenosaunee and certain Constituent Nations; Robert Coulter, Curtis Berkey, of counsel.

Goodwin Proctor & Hoar, Boston, Mass., Hiscock & Barclay, Syracuse, N.Y., Sherman & Sterling, Huber Lawrence & Abell, New York City, Robert Abrams, Atty. Gen., State of N.Y., Albany, N.Y., for defendants; Allan van Gestel, Jeffrey C. Bates, Boston, Mass., Richard Hughes, Syracuse, N.Y., Arnold Bauman, David Marks, Howard Schmertz, New York City, David Roberts, Asst. Atty. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION & ORDER

McCURN, District Judge.

Plaintiffs and plaintiff-intervenors in the present actions are the descendants and successors-in-interest to the Oneida Indian Nation (Oneidas). They claim title to and the right to possess approximately six million acres of land in central New York. Plaintiffs base their claim on aboriginal title confirmed by United States treaty. The land at issue extends in a fifty to sixty mile wide strip from the Canadian border to the Pennsylvania border. The Oneidas sold the land in question to New York State in two treaties, the Treaty of Fort

Herkimer in 1785 and the Treaty of Fort Schuyler in 1788. Both treaties were concluded before the United States Constitution[1] and the Indian Trade and Intercourse Act (Nonintercourse Act)[2] were enacted while the Articles of Confederation were in effect. Plaintiffs claim that the 1785 and 1788 treaties with New York are invalid under the Proclamation of 1783, and the Treaty of Fort Stanwix in 1784 between the United States government and the Six Nations Iroquois Confederacy.[3]

Defendants' motions to dismiss are presently before the court on remand from the Second Circuit. In the Fall of 1984, the court held an evidentiary hearing on the meaning of the Articles of Confederation and the treaties at issue pursuant to the Second Circuit's instructions in *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070 (2d Cir.1982). After carefully considering the evidence submitted in connection with the evidentiary hearing, including the testimony and reports of the parties' experts, primary and secondary source documentation, the history of the period, the parties' arguments, and the relevant case law, the court grants defendants' motions.

## BACKGROUND

Plaintiffs in 78–CV–104 are the Oneida Indian Nation of New York and several of its members. They claim to be the direct matrilineal descendants of the aboriginal Oneida Indian Nation. The New York Oneidas filed their complaint on March 3, 1978, against New York State; the State Thruway Authority; various state agencies, departments, and officials; and a proposed defendant class. An amended complaint was filed on July 3, 1980. Plaintiffs

in 78–CV–104 have not moved to certify the defendant class.

Plaintiffs in 79–CV–798 are the Oneida Indian Nation of Wisconsin and the Oneida of the Thames Band, a Canadian tribe. They also claim to be the direct successors-in-interest to the original Oneidas. The complaint in 79–CV–798 was filed on December 5, 1979, against a proposed defendant class, New York State, various state agencies and officials, the counties and municipalities within the claim area, several businesses, and numerous individual landowners. On March 4, 1980, the court certified a defendant class consisting of all persons who claim an interest in any portion of the subject land described in plaintiffs' complaint, with the exception of individual Oneida Indians and persons who occupy the land as a principal place of residence to the extent of the residence and two surrounding acres. *Oneida Indian Nation of Wisconsin v. State of New York*, 85 F.R.D. 701 (N.D.N.Y.1980). The court estimates that the defendant class includes approximately 60,000 individuals, businesses, and governmental entities. In 1984, the Houdenosaunee, also known as the Six Nations Iroquois Confederacy, intervened as plaintiffs. *Oneida Indian Nation of Wisconsin v. State of New York*, 732 F.2d 261 (2d Cir. 1984). On February 3, 1985, the Thames Band filed an amended complaint aligning their claims with the Houdenosaunee's claims.

Plaintiffs in both actions contend that the United States government guaranteed the Oneidas possession of their land in the Proclamation of September 22, 1783, and the Treaty of Fort Stanwix in 1784. They argue that the 1783 Proclamation and the Fort Stanwix Treaty were valid exercises of the central government's authority un-

---

**1.** Article I, section 8 cl. 3 of the United States Constitution provides in part, "The Congress shall have power (t)o regulate Commerce ... with the Indian Tribes."

**2.** The Indian Trade and Intercourse Act of 1790, Act of July 22, 1790, ch. 33 § 4, 1 Stat. 137, more commonly known as the Nonintercourse Act, and its subsequent amendments forbid the sale of Indian lands without the federal govern-

ment's approval. The present Nonintercourse Act is codified at 25 U.S.C. § 177.

**3.** The facts of these actions are set forth in detail in the court's earlier decision *Oneida Indian Nation of New York v. State of New York*, 520 F.Supp. 1278 (N.D.N.Y.1981), *aff'd in part and rev'd in part*, 691 F.2d 1070 (2d Cir.1982). Familiarity with the court's prior decision is assumed.

der the Articles of Confederation and/or the government's "external sovereignty" powers. According to plaintiffs, the Treaty of Fort Herkimer in 1785 and the Treaty of Fort Schuyler in 1788 between the Oneidas and New York State are void because the central government did not consent to the transfer of Oneida land to New York.

Plaintiffs seek a declaration that they are the owners of and have the right to possess the land in question.[4] They also demand possession of the land claimed, the fair rental value of the land for the period of dispossession, costs, and attorneys' fees. In addition, plaintiffs in 78–CV–104 claim interest on the fair market rental value, the tolls that the New York Thruway has collected for passage over Oneida land during plaintiffs' dispossession, and a declaration of plaintiffs' hunting and fishing rights under the 1788 Treaty if the Treaty is not void.

By Memorandum-Decision and Order dated July 24, 1981, and amended on September 10, 1981, the court granted defendants' motions to dismiss in both actions. The court held that plaintiffs had standing to challenge the 1785 and 1788 Treaties, the action did not present a nonjusticiable political question, and the Eleventh Amendment did not bar plaintiffs' actions. However, the court held that plaintiffs failed to state a claim upon which relief could be granted because under the Articles of Confederation, the states had not effectively delegated to the central government their authority to extinguish Indian title within the states' respective boundaries. Consequently, Congress did not have the authority to forbid the states from forming treaties to extinguish title to Indian land within the states' borders. The court also found that New York's conduct did not create a constructive trust, the court could not inquire into the justness of the state's actions, and the Indians did not retain any rights pro-

tected under the Nonintercourse Act even if the 1788 Treaty created a perpetual lease. *Oneida Indian Nation of New York v. State of New York*, 520 F.Supp. 1278 (N.D.N.Y.1981).

The Second Circuit affirmed in part and reversed in part. It agreed with this court's determination on standing, justiciability, the Eleventh Amendment, and plaintiffs' rights under the Nonintercourse Act. However, the Second Circuit remanded the present actions with instructions to hold an evidentiary hearing on the meaning of the Articles of Confederation and the treaties at issue. *Oneida Indian Nation of New York*, 691 F.2d 1070.

Pursuant to the Second Circuit's instructions, this court formulated the following issues for reconsideration at the evidentiary hearing:

(a) Whether Article IX cl. 1 of the Articles of Confederation included the power to make treaties with Indian tribes, and whether the Fort Stanwix Treaty was a valid exercise of those powers and was therefore binding on New York State. *See* 691 F.2d at 1086–91.

(b) Whether the Article IX cl. 1 powers of Congress are limited by the qualified power of Congress under cl. 4, to manage Indian affairs. *See* 691 F.2d at 1091–92.

(c) Whether the Fort Stanwix Treaty of 1784 precluded New York State from unilaterally extinguishing Indian title to tribal land located within its borders. *See* 691 F.2d at 1092–93.

(d) Whether the Proclamation of 1783 was authorized by Article IX, cl. 4, and whether it was meant to protect the lands of all non-assimilated Indians, or merely those Indians upon lands outside state borders. *See* 691 F.2d at 1093–95.

---

**4.** In the alternative, plaintiffs claim that the 1788 Treaty was a lease arrangement. If the court refuses to declare the 1788 Treaty void, plaintiffs seek a declaration that they have a reversionary or beneficial interest in the land conveyed and an order directing the State to perform its obligations under the Treaty. The Second Circuit has affirmed this court's holding that the 1788 Treaty was a sale and not a lease. *Oneida Indian Nation of New York*, 691 F.2d at 1096.

*Oneida Indian Nation of New York,* Nos. 78–CV–104, 79–CV–798 at 4–5 (N.D.N.Y. Oct. 10, 1983) (Prehearing Order).

The evidentiary hearing was held from September 19, 1984, through October 11, 1984. The parties presented historians, political scientists, and an anthropologist as experts on the confederal period and Indian relations. In addition to their hearing testimony, the experts submitted reports supported by primary and secondary sources. Defendants' motions to dismiss are again ready for determination. The following constitutes the court's decision.

## DISCUSSION

In *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 558–59, 8 L.Ed. 483 (1832), Chief Justice John Marshall left unanswered the question of whether the individual states had the power to extinguish Indian title during the confederal period. The present motions require the court to answer this question. The court's inquiry begins by examining the unique and often troubling legal relationship between the United States and the Indian nations within its borders.

### A. *The Doctrine of Discovery*

■ Plaintiffs' claim to the land is based on aboriginal title. Aboriginal title is governed by the Doctrine of Discovery, a legal fiction which the Supreme Court developed in the early 1800s. The Court created the Doctrine of Discovery to reflect European policy toward the American Indians and to explain the discovering nations and the native Americans' legal rights to native land. *See e. g. Worcester,* 6 Pet. 515, 31 U.S. 515; *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). The doctrine provides that the "discovering nations held fee title to (the natives') lands, subject to the Indians' right of occupancy and use. As a consequence, no one could purchase Indian land or otherwise terminate aboriginal title without the consent of the sovereign." *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985). *See Oneida*

*Indian Nation of New York State v. County of Oneida,* 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974). In *McIntosh,* Chief Justice Marshall explained:

On the discovery of this immense continent, the great nations of Europe were eager to appropriate to themselves so much of it as they could respectively acquire.... But as they were all in pursuit of nearly the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle, which all should acknowledge as the law by which the right of acquisition, which they all asserted, should be regulated, as between themselves. This principle was, that discovery gave title to the government by whose subject, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.... Those relations which were to exist between the discoverer and the natives, were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.

In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were, necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as a just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished and their power to dispose of the soil, at their own will, to whomever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it. While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the

soil, while yet in possession of the natives. These grants have been understood by all, to convey a title to the grantees subject only to the Indian right of occupancy.

*McIntosh*, 8 Wheat. at 572–74, 21 U.S. at 572–74.

Under the Doctrine of Discovery the discovering nation, in the present actions Great Britain, had fee title to Indian land which was good against all other discovering nations. The Indian tribes had the right to occupy and use the land. This right is generally known as aboriginal or Indian title. The tribe's right of occupancy could only be extinguished by the sovereign's purchase or conquest.

■ The right to acquire Indian land once Indian title has been extinguished is called the right of preemption. Generally, the rights of extinguishment and preemption are joined. However, they are separate powers and need not be held by the same entity. *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810). *See Oneida Indian Nation of New York State,* 414 U.S. at 667, 94 S.Ct. at 777.

Before the American Revolution Great Britain, as the sovereign, held the right to extinguish Indian title and the right of preemption. Initially, Great Britain allowed the individual colonies to purchase Indian land and extinguish Indian title within their charter limits. However, widespread encroachment on Indian land, mismanagement of Indian trade, and hostilities with the French created the need for a centralized Indian policy, particularly for acquiring Indian land. Horseman, Ex. 1, p. 1.[5] On October 7, 1763, Great Britain issued a proclamation which prohibited the colonies from purchasing Indian land or trading with the Indians without the Crown's authority. The Crown appointed two "Superintendents of Indian Affairs" to regulate dealings with the Indians and pro-

hibited white settlement west of the Appalachians. Proclamation of 1763 (Oct. 7, 1763), *reprinted in* 3 W. Washburn, *The American Indian and the United States* 2135–39 (1973), Ex. D2, X I. Great Britain thus retained and exercised both the right to extinguish Indian title and the right of preemption just before the colonies declared their independence.

During the pre-revolutionary period, the colonies were expanding their settlements and trying to consolidate their charter land claims. They saw the Proclamation of 1763 and Great Britain's centralization of Indian affairs as an attempt to give favored traders and land speculators western lands to the colonies' detriment. Like the Stamp Act and Quartering Act, the colonists considered the Proclamation of 1763 an unwarranted intrusion into colonial affairs. Great Britain's centralization of Indian affairs eventually became one of the grievances which led to the American Revolution. Ketchum, Ex. D2, p. 1; Tr. pp. 0521–22, 0556–57.

B. *Source of Congress' Authority During the Confederal Period*

Before the Articles of Confederation were ratified, Congress acted as a revolutionary government. As such, it does not fit neatly into the legal theories of sovereignty. Although it is generally believed that Great Britain's sovereign powers passed to the individual colonies when the colonies declared their independence, the Supreme Court has recognized that certain external sovereign powers vested in the central government.

As a result of the separation from Great Britain by the colonies, acting as a unit, the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America. Even before the Declaration, the colonies were a unit

---

5. In this opinion the hearing exhibits are cited Ex. —— and the hearing transcript Tr. ——. The parties' experts are indicated by their surnames. The experts' written opinions were introduced into the hearing record as exhibits.

The above citation therefore refers to Professor Horseman's written opinion which is Hearing Exhibit 1. The primary source documents attached as exhibits to the experts' written opinions are cited Ex. —— X ——.

in foreign affairs, acting through a common agency—namely, the Continental Congress, composed of delegates from the thirteen colonies. That agency exercised the powers of war and peace, raised an army, created a navy, and finally adopted the Declaration of Independence. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 316–17, 57 S.Ct. 216, 219, 81 L.Ed. 255 (1936).

During the pre-confederal period, and even before the states had enacted their individual constitutions, Congress controlled foreign affairs and matters of war and peace. As noted above, the United States in Congress assembled declared independence from Great Britain, made alliances with foreign nations, and established an army and navy. Congress also dealt with the Indian nations, at least in matters concerning war and peace. Horsman, Ex. 1, pp. 7–8. It established Indian departments to handle Indian affairs and to advise Congress. At the beginning of the conflict with Great Britain, Congress sent the Six Nations Iroquois Confederacy a request to remain neutral. Speech to the Six Nations, II *Journals of the Continental Congress* 177, 182 (July 13, 1775), Ex. 2, X 10. *See also* Resolution to Seek Indian Neutrality, X *Journals of the Continental Congress* 110–11 (Feb. 2, 1778), Ex. 2, X 17. When the Senecas, Mohawks, Onondagas, and Cayugas allied with Great Britain, congress enlisted the Oneida and Tuscaroras'

help and waged war against the hostile tribes.

The fact that Congress had certain powers of external sovereignty during the pre-confederal period, whether directly from Great Britain or indirectly from the colonies' implied consent, does not mean, however, that fee title to Indian land and the right to extinguish Indian title passed to congress. The Supreme Court has stated in dicta:

It is true the United States never held fee title to Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the pre-emptive right to purchase from the Indians, was in the State....

*Oneida Indian Nation of New York State*, 414 U.S. at 670, 94 S.Ct. at 778.[6] *See also Fletcher*, 6 Cranch at 141–42, 10 U.S. at 141–42; *Mohegan Tribe v. Connecticut*, 638 F.2d 612, 625 (2d Cir.1980), *cert. denied*, 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981); Horsman, Tr. 1016–17 (powers of preemption and extinguishment "melded" in the states prior to Articles of Confederation).

The treaties at issue in the present actions were signed after the Articles of Confederation were ratified. The authority to govern in this country has always come ultimately from the people by either an express or implied grant. *See Penhallow v. Doane's Administrators*, 3 U.S. (3 Dal-

---

6. The above quote is part of the Supreme Court's discussion of the federal government's exclusive right to extinguish Indian title under the Constitution and Nonintercourse Act. The Court begins its discussion by stating:

It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law.

*Oneida Indian Nation of New York State,* 414 U.S. at 667, 94 S.Ct. at 777. The full text of the above quote provides:

The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13. It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the pre-emptive right to purchase from the Indians, was in the State, *Fletcher v. Peck,* 6 Cranch 87, 3 L.Ed. 162 (1810). But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law.

*Id.* at 670, 94 S.Ct. at 778.

las) 54, 80, 103, 109, 1 L.Ed. 507 (1795); *Ware v. Hylton,* 3 U.S. (3 Dallas) 199, 231–32, 1 L.Ed. 568 (1796); Declaration of Independence (July 4, 1776), *reprinted in* U.S.C.A. Const. Art. 1 § 1—Art. 1 § 8 cl. 3. (stating, "That to secure these rights [life, liberty and the pursuit of happiness], Governments are instituted among Men, deriving their just powers from the consent of the governed...."); Art. of Confed., art. XIII, *reprinted in* U.S.C.A. Const. Art. 1 § 1—Art. 1 § 8 cl. 3, Ex. D2 X 4 (signatory clause stating, "Know ye that we the undersigned delegates, by virtue of the power and authority to us given for that purpose, do by these presents, in the name and in behalf of our respective constituents, fully and entirely ratify and confirm each and every of the said articles of confederation and perpetual union...."); Faulkner, Ex. C, pp. 35–37; Rakove, Ex. E2, pp. 15–16; Scigliano, Ex. B, pp. 5–7. No matter what congress' powers were before the Articles of Confederation, the Articles' ratification redefined the central government, essentially creating a new government. The court must therefore look to the Articles of Confederation to determine what powers congress possessed.

## C. *Allocation of Power under the Articles of Confederation*

█ Although interpreting the Articles of Confederation is more difficult than contemporary statutory construction because of the passage of time, the approach is the same. To determine the Articles' meaning the court must examine the Articles' language, the legislative history, the interpretations that the period's statesmen and historical experts have given the Articles, how the Articles were applied, the period's general history, and relevant secondary sources.

The colonies attempted to establish a unique form of government under the Articles of Confederation. Their rebellion against Great Britain was a rebellion against too much central government. Preserving the individual states' rights was therefore extremely important to the con-

gressional delegates. However, they also realized that thirteen separate governments could not effectively wage war against a major European power or gain recognition from the European community. The thirteen states needed to function as a single unit in foreign relations and matters of war and peace. The framers of the Articles of Confederation attempted to create a nation where the individual states retained power over internal affairs and the central government had power over external affairs, including foreign relations and war and peace. Rakove, Ex. E2, p. 17.

Having just thrown off too much central government, however, the individual states were not about to give the new government too much power, even in external matters. They tended to retain authority over essential areas necessary for the central government to effectively exercise its delegated power. For example, the United States in Congress assembled was given exclusive power over war and peace, but the states retained the power of taxation. Art. of Confed., art. VIII cl. 2. Congress also had exclusive power to form treaties and alliances with foreign nations, but commerce treaties could not prohibit the states from imposing "imposts and duties on foreigners" or "prohibiting the exportation or importation of any species of goods or commodities whatsoever." Art. of Confed., art. IX cl. 1. As a result, congress often lacked essential enforcement powers, and the states tended to pursue their own interests to the detriment of the whole. Eventually, the United States was forced to create a new government with greater centralized powers "in order to form a more perfect union."

█ Article II of the Articles of Confederation provides for the general allocation of powers and reflects the congressional delegates' desire to protect the states' rights. Article II provides:

Each State retains its sovereignty, freedom and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to

the United States, in Congress assembled.

Art. of Confed., art. II. Congress thus possessed only those powers which the Articles of Confederation expressly delegated to it. Lerner, Ex. A, p. 23; Tr. 96.

■ Article XIII of the Articles provides: Every State shall abide by the determinations of the United States in Congress assembled, on all questions which by this confederation are submitted to them. And the articles of this confederation shall be inviolably observed by every State, and the Union shall be perpetual; nor shall any alteration at any time hereafter be made in any of them; unless such alteration be agreed to in a Congress of the United States, and be afterwards confirmed by the Legislatures of every State.[7]

Plaintiffs argue that Article XIII functions as a supremacy clause. Defendants disagree. Defendants' expert Professor Rakove maintains that Article XIII is merely wishful thinking. The Second Circuit, however, has held that the central government's lack of power to enforce its authority under the Articles is irrelevant. *Oneida Indian Nation of New York*, 691 F.2d at 1095 n. 21. Although the confederal government was a sovereign entity of expressly limited powers, its powers would have been a nullity if the individual states' authority superceded congress' authority in those areas expressly delegated to the central government. Accordingly, Article XIII made congress' authority over its expressly delegated powers paramount to the states' authority.[8] *See* Lerner, Tr. 104 (conceding on cross-examination that Article XIII made the powers expressly delegated to congress mandatory); *Oneida Indian Nation of New York*, 691 F.2d at 1091.

### D. *Indian Power under the Articles of Confederation*

Congress' Indian powers are found in Article IX of the Articles of Confederation. Clause 4 which deals specifically with Indian affairs, provides:

The United States in Congress assembled shall also have the sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated.

Clause 1 gives "The United States in Congress assembled ... the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article...." The exception in Article VI cl. 5 provides that "(n)o State shall engage in any war without the consent of the United States in Congress assembled, unless such State be actually invaded by enemies, or shall have received certain advice of a resolution being formed by some nation of Indians to invade such State, and the danger is so imminent as not to admit of a delay, till the United States in Congress assembled can be consulted...."

Contemporary historical records reveal that the extent of congress' Indian powers was a source of considerable confusion and was hotly debated throughout the confederal period. The historical events surrounding the Articles of Confederation's enactment and Indian policy at that time provide insight into the framers' intent. Plaintiffs contend that Indian relations were considered external in nature and were given to congress as part of its external sovereign powers. Defendants argue that Indian affairs were perceived as internal; therefore, Indian relations within the states' borders were left to the individual states. Neither party is correct. The Indian tribes were not treated solely as foreign

---

**7.** The signatory clause also provides, "(T)he articles thereof shall be inviolably observed by the States we re(s)pectively represent, and that the Union shall be perpetual." Art. of Confed. art. XIII.

**8.** For example, congress' war and peace and treaty-making powers made foreign treaties binding upon the states. The fact that some of the states violated the Treaty of Paris and congress was powerless to enforce the treaty, did not legitimize the states' actions.

nations or as citizens of the states. What is most striking about Indian relations during this period is that they were unique. The Supreme Court's conflicting descriptions of the Indian tribes in its early decisions emphasize their unique status. *See eg. Worcester*, 6 Pet. at 559, 31 U.S. at 559; *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 15–17, 8 L.Ed. 25 (1831). *See also* Horseman, Tr. 987.

The Indian tribes, like those comprising the Six Nations Iroquois Confederacy, were independent, sovereign entities. They governed themselves and were generally not subject to state or national law. Their lands crossed state boundaries, and they were capable of waging war on the white settlements at great expense to the fledgling nation. However, the Indians did not own fee title to their land. They had only the right of occupancy which the sovereign could extinguish. Moreover, congress did not ratify Indian treaties like foreign treaties. Report of Senator Carroll to the Senate on Ratification of the Fort Harmar Treaty of 1789 (Sept. 18, 1789), *reprinted in* 1 *American State Papers, Indian Affairs*, 59 (Richardson ed. 1932), Ex. B X 12. Faulkner, Ex. C, p. 5; Rakove, Ex. E2, pp. 84, 104–05; Tr. 786–88. Perhaps the best description of the Indian tribes' unique status is found in *Cherokee Nation*. The Supreme Court described the Indians as "domestic dependent nations". *Cherokee Nation*, 5 Pet. at 17, 30 U.S. at 17. Indian relations therefore did not fall neatly within either congress' external powers or the states' internal sovereignty. As a result, both the central government and the individual states treated with the Indians both before and after the Articles of Confederation.

Indian policy was based on two overriding concerns, war and land. Horsman, Tr. 991. As noted above, the Indian tribes were powerful, independent "nations". Neither the new government nor the individual states had the economic resources and manpower to engage in a major Indian war. During the pre-confederal period con-gress' primary concern was keeping the Indians from joining the British in the Revolutionary War. Afterwards, congress feared that incursions on Indian land and fraudulent dealings with the Indians would induce the tribes to unite against the nation in an Indian war. Congress also feared that the Indians would again ally with the British who refused to vacate their forts at Niagara and Oswego after the Treaty of Paris was signed. Moreover, continued Indian hostilities would hinder settlement of the national domain. The states were even less able to absorb the cost of Indian wars.

The states were also engaged in a major controversy over the Western lands. The "landed states", including Massachusetts, Virginia, North Carolina, Georgia, and Connecticut, each claimed title under their charters to the lands "westward to the South Seas". New York was also a "landed state". It claimed western lands under Great Britain's treaties with the Six Nations Iroquois Confederacy. In these treaties the Six Nations placed themselves "under the Crown's protection." The "landless states" New Hampshire, Maryland, Rhode Island, New Jersey, Pennsylvania, Delaware, and South Carolina had fixed borders under their charters. They wanted to limit the landed states' size to more realistic dimensions and to establish a national domain in the West.[9] These lands were necessary to finance the nation's war debt and to compensate the soldiers who had fought in the Revolutionary War. The ability to obtain western land from the Indians by cession or purchase was essential to establishing a national domain. Peace on the frontiers was also necessary to settle the western lands.

The western lands' dispute was one of the primary reasons why the Articles of Confederation, which were submitted to congress in 1777, were not ratified until 1781. Horsman, Ex. 1, p. 10. Maryland, a landless state, did not sign until New York ceded its western land claim to congress in February 1781. Virginia and Connecticut offered their land cessions shortly there-

**9.** The proposed national domain included the Ohio and Mississippi River Valleys.

after although congress refused to accept Virginia's cession until 1784. Georgia did not make its cession until after the Constitution was enacted.

Overlapping land claims also created conflict among the landed states. They attempted to consolidate their claims by establishing settlements in disputed areas. *See* Onuf, Ex. 3, pp. 2, 22–23, 25–26. The ability to acquire Indian land was essential. In 1783, Massachusetts revived its charter claim to western New York. The dispute was not settled until the Treaty of Hartford in 1786.

Moreover, land speculating companies and private venturers were buying large tracts of Western land. These purchases threatened both Congress' plans for a national domain and war with the Indians. *See* Letter of George Washington to James Duane (Sept. 7, 1783), *reprinted in* 27 *The Writings of George Washington*, 133–40 (J. Fitzpatrick ed. 1938) Ex. 3 X 94; Letter of Phillip Schuyler to the President of Congress (July 29, 1783), *reprinted in* 3 *Papers of the Continental Congress*, 601–08, Ex. 3 X 93. These events substantially influenced the Articles of Confederation, national and state Indian policy, and the treaties at issue in the present actions.

### E.  *Article IX cl. 4*

Article IX cl. 4 of the Articles of Confederation contains congress' primary authority over Indian affairs. It gives the United States in Congress assembled "the sole and exclusive right and power of regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of a State within its own limits be not infringed or violated." Although clause 4 can be viewed primarily as an "Indian commerce clause", *see* J. Madison, *The Federalist #42* 329, 334 (Jan. 22, 1788), Ex. B X 3 (describing clause 4 as regulating commerce with the Indians), "managing all affairs with the Indians" is broad enough to include making war and peace with them. Congress certainly believed that it had authority under clause 4 to deal with Indian

hostilities. *See eg.* Proclamation of 1783, XXV *Journals of the Continental Congress* 602 (Sept. 22, 1783), Ex. E3 X 89 (citing Article IX cl. 4 as authority).

However, the "not members" provision and the legislative right proviso limit congress' "sole and exclusive" clause 4 powers. The final version of clause 4 was a compromise between the landed and landless states in their dispute over the western lands. The congressional delegates intentionally made the limitations on congress' clause 4 powers ambiguous to achieve a consensus. *See Worcester*, 6 Pet. at 558–59, 31 U.S. at 558–59 (provisions were ambiguous); J. Madison, *The Federalist #42* at 334, Ex. B X 3 (language "obscure and contradictory"). The reservation of the states' rights also reflects the delegates' concern for protecting the states' authority against too much centralization.

The legislative history provides insight into the framers' intent. Benjamin Franklin's 1775 draft of the Articles of Confederation gave congress complete control over Indian affairs. No colony could engage in an offensive Indian war without congressional consent. Congress was to form an alliance with the Six Nations Iroquois Confederacy, and no private person or colony could purchase Indian land. Only the United States in Congress assembled could contract for Indian land and only for the benefit of all the colonies. Benjamin Franklin's Articles of Confederation, II *Journals of the Continental Congress* 195–99 (July 21, 1775), Ex. E2 X 8.

Franklin's 1775 plan was never submitted to congress, but John Dickinson used it in drafting his version of the Articles. The Dickinson Draft provided that no colony could engage in war without congress' consent unless it was "actually invaded by Enemies or shall have received certain advice of a Resolution being formed by some Nation of Indians to invade such Colony or Colonies, and the Danger is so imminent, as not to admit a Delay till the other Colonies can be consulted." Dickinson's Draft of the Articles of Confederation art. XIII, V *Journals of the Continen-*

*tal Congress* 546–54 (July 12, 1776), Ex. C X 6A. Congress was to form a "perpetual Alliance, offensive and defensive" with the Six Nations and "other neighbouring Nations of Indians." It would also set the states' boundaries. Until the geographical limits of the states were ascertained, no private person or colony could purchase Indian land. After congress determined the colonies' limits, only congress would be able to purchase Indian land outside of the colonies' boundaries. Dickinson's Draft of the Articles of Confederation, art. XIV, XVIII, Ex. C X 6A. Article XVIII also gave the United States in Congress assembled "sole and exclusive Right and Power of determining on Peace and War, except in the Cases mentioned in the Thirteenth Article (emergency Indian attacks)" and "exclusive Right and Power of ... managing all Affairs with the Indians." By giving congress the exclusive right to purchase Indian land outside the states after the states' limits were determined, the Dickinson Draft implies that the states could purchase Indian land within their limits once those limits were fixed.

Dickinson's Draft was submitted in July, 1776. The Committee of the Whole eliminated the language which authorized congress to set the states' borders and to purchase land outside of the states. Congress' "exclusive Right and Power of.... Regulating the Trade, and managing all Affairs with the Indians" was rephrased and limited to Indians "not members of any of the States."

On October 27, 1777, two amendments were proposed. The first would have eliminated "not members of any of the States" and substituted, "not residing within the limits of any of the United States." This proposal would have placed a geographical limit on congress' power. Congress would only be able to manage all Indian affairs, including war and peace, outside of the states' borders.

The second proposal would have eliminated the entire paragraph and given congress the right of "managing all affairs relative to war and peace with all Indians not members of any particular State, and regulating the trade with such nations and tribes as are not resident within such limits wherein a particular State claims, and actually exercises jurisdiction." IX *Journals of the Continental Congress* 841, 844 (Oct. 27, 1777), Ex. C X7. Assuming that "not members" means nonassimilated Indians,[10] congress would have war and peace powers over Indians both inside and outside of the states. However, it would only have authority over trade with the Indians located outside of the states' boundaries. The states would retain all power, except war and peace powers, over the Indians residing within their borders.

Congress rejected both these amendments. Instead, it accepted a compromise which retained the previous language and added the legislative proviso. Congress was given the power to "regulate trade and manage all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated." IX *Journals of the Continental Congress* 844, 845 (Oct. 28, 1777), Ex. C X7.

The various drafts of the Articles reveal several things. First, the drafts went from greater centralized control over Indian affairs to less centralized control. Second, congress knew how to express geographical restrictions when it wanted. Third, even the Dickinson Draft, which proposed the greatest centralization of the drafts that were actually submitted to congress, allowed the states to purchase Indian land within their boundaries once those boundaries were set.

■ This legislative history as well as contemporary historical interpretation and congress' actual practice indicate that the "not members" language in clause 4 was not intended as a geographical restriction on congress' Indian authority. *The Oxford English Dictionary* defines a "member" as a "constituent part of anything" or "(e)ach of the individuals belonging to or forming a

10. See discussion *infra* pp. 431–32.

society or assembly." VI *The Oxford English Dictionary* 326 (1970). In contrast, a person is "resident" in a place if that person is "residing", "dwelling or having an abode in a 'place'." *Id.* at 518.[11] This is how James Madison understood the " 'not members' " provision.[12] In his November 27, 1784, letter to James Monroe, he states, "By Indian(s) not members of a State, must be meant those, I conceive who do not live within the body of the Society, or whose Persons or property form no objects of its laws." Letter Of James Madison to James Monroe (Nov. 27, 1784), *reprinted in* 8 *Papers of Madison* 156 (R. Rutland, *et al.* eds.), Ex. E3 X 140.

The legislative history discussed above supports Madison's interpretation. Congress rejected the two amendments which would have expressly limited congress' authority over Indian affairs by geographical location. In the second proposed amendment the "not members" restriction attached to congress' war and peace powers was also clearly intended to give congress greater authority over war and peace than trade, which was restricted to Indians not "resident" within the states' limits or jurisdiction.

Moreover, congress' actions support Madison's understanding of the "not members" restriction. Congress did in fact deal with Indians who dwelt within the states' limits. The Ordinances of 1775 and 1786 established the Indian departments which had jurisdiction over Indian territory within the states, and the various peace treaties, including the treaties of Fort Stanwix and Hopewell, involved Indian tribes located within the states' recognized borders.

Additional evidence that the "not members" provision referred to nonassimilated Indians is found in James Duane's advice to New York Governor Clinton and in the Treaty of Galphinton. Both Duane and the State of Georgia attempted to use the "not members" restriction to circumvent con-

gress' Indian authority. Duane advised Governor Clinton that the Six Nations "should be treated as *ancient dependents of this (New York) state*, placed under its protection, with all their territorial rights, by their own consent publicly manifested in solemn and repeated treaties.... On this ground the tribes in question may fall under the character of *Members of the state* with the management of which Congress have no concern." (emphasis in the original). Letter of James Duane to Governor George Clinton (n.d.), *reprinted in* 1 *Proceedings of the Commissioners of Indian Affairs* 21 n. 1 (B. Hough 1861), Ex. C X24. The Treaty of Galphinton between Georgia and the Creeks declared that the Indians within Georgia's limits "have been, and now are, members of the same, since the day and date of the constitution of the state." Treaty of Galphinton (Nov. 12, 1785), *reprinted in* 1 *American State Papers, Indian Affairs* 17, Ex. B X 21. Moreover, the legislative proviso would be superfluous if the "not members" language restricted congress to dealing with Indians outside of the states. The court finds that the "not members" provision was intended to restrict congress' Article IX cl. 4 authority of "managing all affairs with the Indians" to nonassimilated Indians.

In the present actions the Six Nations, including the Oneidas, were independent tribes. They were not assimilated into the society of New York or any other state. *See* Horsman, Tr. 1038–39. Accordingly, the Oneidas were "not members of any of the States" within the meaning of Article IX cl. 4.

■ The legislative right proviso is less clear. Again, James Madison offers the most consistent interpretation of congress' intent:

In the case of Indians of this description the only restraint on Congress is

---

**11.** To "reside" means "(t)o dwell permanently or for a considerable time, to have one's settled or usual abode, to live, *in* or *at* a particular place." VI *Oxford English Dictionary* 517 (1970).

**12.** *The Oxford English Dictionary* indicates that these usages were prevalent during pre-confederal and confederal periods.

imposed by the *Legislative authority* of the State. If this proviso be taken in its full latitude, it must destroy the authority of Congress altogether, since no act of Congs. within the limits of a State can be conceived which will not in some way or other encroach upon the authority [of the] States. In order then to give some meaning to both parts of the sentence, as a known rule of interpretation requires, we must restrain this proviso to some particular view of the parties. What was this view? My answer is that it was to save to the States their right of preemption of lands from the Indians. My reasons are. 1. That this was the principal right formerly exerted by the Colonies with regard to the Indians. 2. that it was a right asserted by the laws as well as the proceedings of all of them, and therefore being most familiar, wd. be most likely to be in contemplation of the Parties. 3. that being of most consequence to the States individually, and least inconsistent with the general powers of Congress, it was most likely to be made a ground of Compromise. 4. it has been always said that the proviso came from the Virga. Delegates, who wd naturally be most vigilant over the territorial rights of their Constituents. (emphasis in the original)

Letter of James Madison to James Monroe (Nov. 27, 1784), *reprinted in* 8 *Papers of James Madison* at 156–57, Ex. 3 X 140.

The states, particularly the landed states, considered their right to preempt Indian land within their individual borders their most important Indian power. The legislative right proviso was proposed by the Virginia delegation. Virginia, a landed state, had strong states' rights sentiments. Madison describes the Virginia delegates as "most vigilant over the territorial rights of their Constituents." *Id.* Like New York and North Carolina, Virginia had recently

enacted a state constitutional provision prohibiting purchases of Indian land without the state's consent.[13] The proviso thus referred to the states' constitutional provisions restricting Indian land contracts. *Id.;* Rakove Ex. E2, pp. 37–38; Tr. 723–24; Ketchum, Ex. D2, pp. 6–8. *See* Lerner, Ex. A, pp. 30, 32.

By the time the Articles were passed, the national domain was imminent. The compromise would allow the states to consolidate their land claims within their recognized limits while leaving the central government free to purchase land in the national domain. Moreover, the compromise would still permit the central government to manage Indian affairs within the states when its actions did not interfere with the states' legislative right. Allowing the states to control Indian land purchases within their borders would also prevent uncontrolled purchases by private land speculators. The legislative proviso was thus less threatening to the landless states' plans for establishing a national domain and the need to prevent Indian hostilities. *See* Letter of George Washington to James Duane (Sept. 7, 1783), *reprinted in* 27 *Writings of George Washington* 133, Ex. E3 X 94.

Georgia and North Carolina did not share Madison's interpretation of the legislative right proviso. Their actions indicate that they believed that congress had no authority to deal with Indians within their respective states. *See* Report of a Committee of the Georgia General Assembly (Feb. 11, 1786), al *American State Papers, Indian Affairs* 17, Ex. B x 25 (Treaty of Galphinton protested as ultra vires); Senate Committee, Claims on the Lands (March 1, 1797), *reprinted in* 1 *American State Papers, Indian Affairs* 78, Ex. B X 24 (Hopewell treaties protested as ultra vires); Letter of Benjamin Hawkins to Thomas Jefferson (June 14, 1786), *reprinted in* 9 *Papers*

**13.** New York's constitution provides: ·
Be it ordained, that no purchases or contracts for the sale of lands, made since (October 14, 1775), or which may hereafter be made with or of any of the said Indians, within the limits of this State, shall be binding on the said

Indians, or deemed valid, unless made under the authority and with the consent of the legislature of this State.
N.Y. Const. art. XXXVII (April 20, 1777), *reprinted in* 5 *Federal and State Constitutions* 2623, 2636 (F.S. Thorpe ed.), Ex. D2 X 7.

*of Thomas Jefferson,* 640, 641 (Boyd ed.), Ex. E3 X 154.

Georgia and North Carolina's views were not shared by the other states. Even New York did not contest the Fort Stanwix Treaty once the treaty had been completed. Moreover, Georgia and North Carolina's interpretation would essentially "annul" the Indian power given to congress, *see Worcester,* 6 Pet. at 557–58, 31 U.S. at 557–58, or at least it would restrict the central government's authority to Indian affairs outside of the states. The framers of the Articles of Confederation expressly rejected this interpretation when they rejected the October 27, 1777 amendments.

Plaintiffs argue that the legislative right proviso reserved the states' right of preemption but only after congress had extinguished Indian title. As discussed hereafter, very little support for plaintiffs' position can be found among the contemporaries of the period or in congress' actions. It is also unlikely that the states which objected so vehemently to the Royal Proclamation of 1763 would agree to retain the right of preemption without the right of extinguishment. Moreover, Madison's interpretation gives effect to all of clause 4's provisions. The court therefore finds that the legislative right proviso in Article IX cl. 4 retained to the states their legislative right to purchase Indian land within the states' limits.

The Six Nations (plaintiff/intervenors) contend that the Oneidas' land was not located within New York's recognized limits because Massachusett's claim to western New York was not settled until 1786. According to the Six Nations, Article IX cl. 4's legislative right proviso and the "not members" restriction, even if they are interpreted geographically, do not apply to the Oneidas. However, the weight of authority is against the plaintiff/intervenors. Once congress accepted New York's western land cession in 1782, New York's border was, for all practical purposes, fixed. The Oneidas were located well east of New York's western border. *See eg.* Letter of James Monroe to James Madison (Nov. 15, 1784), *reprinted in* 1 *Writings of Monroe* 46, 47 (Hamilton ed.), Ex. C X 39; Rakove, Ex. E2, pp. 50–54, 96–97; Faulkner, Tr. 451; Onuf, Tr. 1317, 1320–22, 1338–39, 1366; Treaty of Hartford (Dec. 11, 1786), Ex. H. *See also* Ex. I; Ex. J (historical maps).

F. *Article IX cl. 1*

■ The other potential source of congress' authority over the Indians is Article IX cl. 1. Clause 1 gives the United States in Congress assembled "sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article." The parties' experts agree that congress had war and peace powers over Indians. However, defendants contend that congress' Indian war and peace powers are part of congress' authority to "manage all affairs with the Indians" under Article IX cl. 4. In support of their position, defendants argue that congress often cited clause 4 language when dealing with the Indians. They also emphasize that clause 4, which deals specifically with congress' Indian authority, is located in the Articles with congress' other internal powers. Congress' war and peace powers, however, are included in clause 1 which deals with foreign affairs.

Although defendants' argument is somewhat appealing, the plain language of clause 1 indicates that congress had clause 1 authority over Indians. The grant in clause 1 is broad; it does not restrict congress' authority to war and peace with foreign nations. The only limitations on congress' clause 1 powers are in Article VI. Article VI prohibits the states from waging war without congress' consent "unless such State be actually invaded by enemies, or shall have received certain advice of a resolution being formed by some nation of Indians to invade such State, and the danger is so imminent as not to admit of a delay, till the United States in Congress assembled can be consulted." Art. of Confed. art. VI cl. 5. The fact that Article IX cl. 1 expressly incorporates Articles VI's reference to wars with Indians shows that

the congressional delegates had Indian war and peace in mind when they granted congress its clause 1 powers. *See* Horseman, Tr. 985–86.

Although congress often cited clause 4 as its authority when dealing with the Indians, the treaties which established peace with the Indians after the Revolutionary War do not cite Article IX cl. 4 as their authority. Moreover, clause 1 grants congress the right of "determining" on war and peace. *See Worcester*, 6 Pet. at 557, 31 U.S. at 557. Such documents as the Proclamation of 1783 and the Ordinance of 1786 which contain clause 4 language do not actually "determine" on war and peace even though they might have indirectly implicated war and peace matters.

Article IX cl. 1 also gives congress "sole and exclusive right and power of . . . entering into treaties and alliances. . . ." There is no question that congress had the authority to enter into treaties with the Indians. *See Id.* at 559; *Oneida Indian Nation of New York*, 691 F.2d at 1089–90. However, congress' treaty-making power in clause 1 was not intended to prohibit the states from forming Indian treaties. Article IX delegates various powers to congress. Article VI complements Article IX by prohibiting the states from exercising congress' Article IX powers. Unlike Articles IX cl. 1 and VI cl. 5's delegation of war and peace powers, neither Article IX cl. 1 nor Article VI's treaty-making provisions contains any reference to Indian treaties. Article VI merely prohibits the states from entering into treaties with foreign nations or other states. The provision which follows and limits congress' sole and exclusive treaty-making power under Article IX cl. 1 deals with commerce treaties. Indian commerce, however, is governed by Article IX cl. 4. The structure and content of Article IX cl. 1 and IV indicate that the framers were not contemplating Indian

treaties in clause 1. Because congress treated Indian treaties differently from foreign treaties, the omission is not unusual. Moreover, if clause 1 prohibited all Indian treaties except those made by congress, the powers reserved to the states in Article IX cl. 4 would be a nullity. In actual practice, both congress and the states formed treaties with the Indians during the confederal period. Accordingly, it follows that Article IX clause 1 did not prohibit the states from entering into treaties with the Indians, except war and peace treaties.

## G. *Views of Contemporary, Historical Statesmen*

The fact that Article IX cl. 1 gave the central government exclusive power of "determining on peace and war" does not mean that the states also gave congress the right to extinguish Indian title within the states' borders or to prohibit the states from purchasing instate Indian land, at least where the states' purchase did not directly interfere with congress' determination on peace and war.[14] After struggling to protect their legislative right in clause 4, the landed states would hardly be willing to cede that right in Article IX cl. 1. As noted above, the delegation of Indian powers caused considerable debate during the confederacy. The views of the leading statesmen indicate that the states retained their power to purchase instate Indian land under the Articles of Confederation.

George Washington had a major influence in shaping Indian policy during the confederal and post-confederal periods. His views on state and congressional Indian authority during the confederacy are expressed in two documents. The first was written in 1783, before the Proclamation of 1783 and the Fort Stanwix Treaty. The second was written in 1790, after the Constitution was enacted.

---

**14.** One of the issues that the Second Circuit remanded is whether the limiting language in Article IX cl. 4 restricted congress' Article IX cl. 1 powers. The court finds no evidence that the "not members" language and the legislative right proviso in clause 4 was incorporated either expressly or impliedly into clause 1. However, as hereafter discussed, the court finds that the states did not intend to give congress the right to prohibit them from purchasing Indian land within their limits when the states gave congress its clause 1 power.

Washington's September 7, 1783, letter to James Duane, Chairman of the congressional advisory committee to the Commander in Chief, influenced both the Proclamation of 1783 and the Treaty of Fort Stanwix. It advised congress on Indian policy and recommended that congress establish peace with the Indian. At that time, the United States was still technically at war with the Indians because the Treaty of Paris did not include the Indian tribes. Like the other statesmen of the period, Washington did not question whether the settlers should eventually take over the Indians' lands. He was concerned about how the settlement would be achieved. Washington considered speculators' attempts to purchase large tracts of Indian land and the plans of some states, including New York, to expel the tribes from their borders a threat to establishing both peace and a national domain. In his letter to Duane, Washington advocates orderly settlement of the land. He writes, "No purchase (of Indian land) under any pretense whatever should be made by any other authority than that of the sovereign power, *or the Legislature of the State in which such lands may happen to be.*" (emphasis added) Letter of George Washington to James Duane (September 7, 1783), *reprinted in* 27 *Writings of George Washington* at 137, Ex. E3 X 94.

Washington's reply to Seneca Chief Cornplanter in 1790 was written while he was President under the Constitution. The Senecas had complained about the Treaty of Fort Stanwix and asked the new government to give back some of their ceded land. Cornplanter also complained about certain land purchases. In his reply Washington explains the difference in the states' powers under the Constitution and the Articles of Confederation:

I am not uninformed, that the Six Nations have been led into some difficulties, with respect to the sale of their lands, since the peace. But I must inform you that these evils arose before the present Government of the United States was established, when the separate States, and individuals under their authority, undertook to treat with the Indian tribes respecting the sale of their lands. But the case is now entirely altered; the General Government, only, has the power to treat with the Indian nations, and any treaty formed, and held without its authority, will not be binding.

Reply of the President of the United States to the Speech of the Cornplanter, *et al.*, (Dec. 29, 1790), *reprinted in* 4 *American State Papers, Indian Affairs* 142, Ex. D2 X 12.

Washington then analyzes the validity of two land purchases made after the Treaty of Fort Stanwix:

Hear well, and let it be heard by every person in your nation, that the President of the United States declares, that the General Government considers itself bound to protect you in all the lands secured to you by the treaty of fort Stanwix, the 22d of October, 1784, excepting such parts as you may since have fairly sold, to persons properly authorized to purchase of you. You complain that John Livingston and Oliver Phelps, assisted by Mr. Street, of Niagara, have obtained your lands, and that they have not complied with their agreement. It appears, upon inquiry of the Governor of New York, that John Livingston was not legally authorized to treat with you, and that every thing that he did with you have been declared null and void, so that you may rest easy on that account. But it does not appear, from any proofs yet in possession of Government, that Oliver Phelps has defrauded you.

*Id.* Washington tells Cornplanter that the federal government is bound by the Treaty of Fort Stanwix to protect the Indians' land except for the land that they have "fairly sold" to persons authorized to purchase from them. Washington then looks to the state to determine whether the purchases in question were valid. Because New York had not "legally authorized" Livingston's purchase, it was void.

Washington's writings reveal that Washington believed, both during the confedera-

cy and afterwards, that under the Articles of Confederation the states could purchase Indian land within their borders. *See* Ketchum, Ex. D2, pp. 11–14; Tr. 0536–41; Faulkner, Ex. C, pp. 45, 58–59. The fact that congress could not control these purchases was one of the "evils" that the Constitution "entirely altered."

James Monroe and James Madison's correspondence concerning the Fort Stanwix peace negotiations concurs with Washington's views. Before the national negotiations, New York attempted to obtain a cession or purchase of land from the Six Nations. When the negotiations failed, Governor Clinton instructed New York observers at the Fort Stanwix Treaty to disrupt the national treaty if the treaty would infringe on New York's legislative rights. Monroe asked Madison's opinion on New York's actions. In his letter of November 15, 1784, Monroe concludes:

> In either event the land held by these *Indians,* having never been ceded either by *N. York* or *Massachusetts* belongs not the *U. States;* the only point then in wh. *N. York* can be reprehensible is, for preceding by a particular [state treaty], the general *Treaty.* This must be attributed to a suspicion that there exists in *Congress* a design to injure her. (emphasis in the original)

Letter of James Monroe to James Madison (Nov. 15, 1784), *reprinted in* 1 *Writings of Monroe* at 47, Ex. C. X 39.

Madison replies:

> The Idea which I at present have of the affair leads me to say that as far as N.Y. may claim a right of treating with Indians for the purchase of lands within her limits, she has the confederation on her side; as far as she may have exerted that right in contravention of the Genl. Treaty, or even unconfidentially with the Comisrs. of Congs. she has violated both duty & decorum.

Letter of James Madison to James Monroe (Nov. 27, 1784), *reprinted in* 8 *Papers of James Madison* at 156, Ex. E3 X 140.

Neither Monroe nor Madison disputes New York's right to purchase Indian land within its limits. Their only uncertainty is whether New York could assert her right at the same time that congress was trying to negotiate a peace treaty. If New York succeeded in obtaining Indian land by purchase or cession, congress would probably not be able to obtain a peace treaty containing a land cession. *See,* Arthur Lee to the Chairman of the Committee of the States (Aug. 4, 1784), 4 *Papers of the Continental Congress* 129, 129–30, Ex. E3 X 126; Report of the Pennsylvania Delegates to the Pennsylvania Assembly (Sept. 25, 1783), 7 *Letters of the Members of the Continental Congress* 308 (E.C. Burnett ed.), Ex. 1 X 31. Madison is unsure of the parties' authority under these circumstances although his use of "duty & decorum" suggests that New York should have consulted congress out of deference rather than legal obligation. *See* Ketchum, Ex. D2, pp. 17–21, Tr. 0542–49; Sigliano, Ex. B, pp. 36–38, 40–41, 44–45; Faulkner, Ex. C, pp. 50–52; Rakove, Ex. E2, pp. 95–98.

Jefferson's interpretation is less clear. He expresses three apparently contradictory opinions over a sixteen month period. Jefferson was both a state and a congressional official.[15] Like Washington, Jefferson was against land speculation in the west. He advocated creating a public domain through state cessions and acquiring land from the Indians in an orderly manner. The problems with Indian relations during the confederacy made Jefferson a strong advocate of centralizing control over all Indian affairs under the Constitution. Ketchum, Ex. D2, pp. 15–16.

In his May 3, 1790, letter discussing Georgia's grant of instate Indian land to a private land company, Jefferson states:

> If the country, instead of being altogether vacant, is thinly occupied by another

---

**15.** Both Jefferson and Madison were members of the Virginia government. Jefferson was governor and Madison was a member of his coun-

cil. Jefferson later became Secretary of State under the Constitution.

nation, the right of the native forms an exception to that of the new comers; that is to say, these will only have a right against all other nations except the natives. Consequently, they have the exclusive privilege of acquiring the native right by purchase or other just means. This is called the right of preemption, and is become a principle of the law of nations, fundamental with respect to America. There are but two means of acquiring the native title. First, war; for even war may, sometimes, give a just title. Second, contracts or treaty.

The States of America before their present union (under the Constitution) possessed completely, each within its own limits, the exclusive right to use these two means of acquiring the native title, and, by their act of union, they have as completely ceded both to the general government. (citations to the U.S. Const. omitted)

T. Jefferson, Opinion upon the Validity of a Grant by the State of Georgia to Certain Companies of Individuals (May 3, 1790), *reprinted in* 3 *Writings of Thomas Jefferson,* 18, 19–20 (Bergh ed. 1907), Ex. B X 33. Jefferson's conclusions are not entirely accurate. Under the Articles of Confederation the states could not obtain Indian land by war because Article VI prohibited the states from engaging in offensive Indian wars without congress' consent. However, Jefferson expressly recognizes the states' right to contract or treat for Indian land within their limits.

Just two months later Jefferson wrote:

The Cherokees were entitled to the sole occupation of the lands within the limits guaranteed to them. The State of North Carolina, according to the *jus gentium* established for America by universal usage, had only a right of pre-emption of these lands against all other nations. It could convey, then, to its citizens only this right of pre-emption, and the right of occupation could not be united to it till obtained by the United States from the Cherokees.

Thomas Jefferson to Secretary of War Knox (Aug. 26, 1790), *reprinted in* 8 *Writings of Thomas Jefferson* 99, 100, Ex. C X 51.

In 1791 Jefferson also wrote:

I am of the opinion ... that the Indians have a right to the occupation of their lands, independent of the States within whose chartered lines they happen to be; that until they cede them by treaty or other transaction equivalent to a treaty, no act of a State can give a right to such lands; that neither under the present constitution, nor the ancient confederation, had any State or person a right to treat with the Indians without the consent of the General Government....

Thomas Jefferson to Secretary of War Knox (Aug. 10, 1791), *reprinted in* 8 *Writings of Thomas Jefferson* 226, 226–27, Ex. C X 52.

Defendants' experts contend that Jefferson's latter opinions refer to grants of land which North Carolina and Georgia had never purchased from the Indians and which were located outside the states' recognized boundaries. In particular, Jefferson's 1791 opinion concerns Georgia's 1789 grant of land located in the intended national domain to the notorious Yazoo Company. *See* Faulkner, Ex. C, pp. 75–77; Ketchum, Ex. D2, pp. 16–17; Sigliano, Ex. B, p. 46. If defendants' experts are correct, Jefferson's latter opinions would be consistent with his May 3, 1790, opinion. Otherwise, no firm conclusions can be drawn from Jefferson's conflicting views. The court, however, notes that he expressed the above opinions after the Constitution was enacted, at a time when North Carolina and Georgia were creating considerable problems with the Indians by taking cessions of their land.

Secretary of War Henry Knox, who had authority over Indian affairs during this period, was a strong advocate of centralized control. Even his writings, however, suggest that the states retained the right to purchase Indian land within their borders. Knox's report to congress on July 17, 1788, concerns the problems between

North Carolina and the Cherokees. Knox recommends that congress issue a proclamation upholding the Hopewell Treaties and deploying troops, if necessary, to enforce the treaties. Knox apparently relies on congress' authority under its war powers when he states that "the said enormities have arisen at length to such an height as to amount to an actual although informal war of the said white inhabitants against the said Cherokees." H. Knox, Report of the Secretary of War on the letter of Col. J. Martin (July 17, 1788), XXXIV *Journals of the Continental Congress* 342 (July 18, 1788), Ex. 1, X39. Knox reports that North Carolina would probably not object "to any equitable interference of Congress to fulfill the said treaty (Hopewell), so far as to oblige all persons to remove from the limits assigned by the treaty who have not fairly purchased the lands of the Indians." He then recommends that the proclamation provide "(t)hat all persons who have settled on any of the said lands unless the same shall have been fairly purchased of the said indians shall be warned at their peril to depart...." *Id.* at 343. Knox thus recognizes that land could be "fairly purchased" from the Indians.

In July 1789 under the new Constitution, Knox again urges congress to pass "a declarative law" that the Indian tribes possess "the right of soil of all lands within their limits" and that they cannot be divested of their right except by "fair and bona fide purchase, under the authority of the United States". Knox explains:

> The independent nations and tribes of Indians ought to be considered as foreign nations, not as subjects of any particular State. Each individual State, indeed, will retain the right of pre-emption of all lands within its limits, which will not be abridged: but the general sovereignty must possess the right of making all treaties, on the execution or violation of which depend peace or war.

Secretary of War Knox to the President of the United States (July 7, 1789), *reprinted in* 1 *American State Papers, Indian Affairs* 52, 53, Ex. 1 X 42. Knox's repeated requests for congress to issue a proclamation or law giving the central government greater control over Indian affairs, particularly land transactions, suggests that congress' power in this area during the confederacy was not absolute. *See* Faulkner, Ex. C, pp. 24–25.

## H. *Congress' Application of the Articles of Confederation*

Congress' actions during the confederal period also indicate that the states retained the right to purchase Indian land within their borders. Two incidents occurred concerning the Fort Stanwix peace negotiations which involved a conflict between the central government's peacemaking powers and the states' right to purchase Indian land. The first involved Pennsylvania's proposal to purchase virtually all of the Indian land within its borders. Perceiving a potential conflict with the national treaty negotiations, Pennsylvania informed congress of its intent and requested a response. However, the Pennsylvania legislature believed that it had the right to extinguish Indian title within its limits. The committee which recommended consulting congress stated:

> (A)lthough the Articles of the Confederation do not by any means explicitly restrict this house from entering on this business independent of Congress, yet being deeply impressed with the delicacy of touching any subject of federal relation, but with the most deliberate caution; and as the letter of a clause in the ninth section appears to involve a doubt, they think proper to submit the following resolution....

Resolution of the General Assembly of Pennsylvania (Sept. 12, 1783), *reprinted in* XXV *Journals of the Continental Congress* 594 (Sept. 20, 1784), Ex. E 3 X 113. Pennsylvania's instructions to its congressional delegates also asserted the state's legislative right:

> Although this business may be said strictly to regard only the internal policy of Pennsylvania, and the conference proposed does not extend to any description

of men without the limits of the United States, nor regard any of the great objects of peace or war; yet our high respect for the Confederation determines us to lay open the whole design of the State to Congress.

*Id.* at 595.

Pennsylvania's proposed treaty presented a serious problem for the central government. Congress hoped to negotiate a large land cession from the Indians at the Fort Stanwix Treaty. If the Indians could obtain money for their land from the states, they would probably not cede their land to the United States. Despite Pennsylvania's assertion that her treaty for land was strictly an internal matter, her actions could have directly jeopardized congress' ability to make peace with the Six Nations.

Congress debated extensively its response to Pennsylvania. Even though Pennsylvania's proposal might have directly interfered with congress' Article IX cl. 1 right to "determine on peace", congress did not forbid Pennsylvania's actions. The delegates rejected various amendments which ordered the state to wait until after congress had completed the national treaty. Congress also rejected amendments which ordered the state to avoid all war and peace matters as the central government's exclusive province. Instead of asserting its authority over the state, congress finally invited Pennsylvania to attend the national treaty for the "sole purpose" of purchasing lands within the state's limits. Congress also instructed the congressional commissioners "to give every assistance in their power ... towards promoting the interest of that State, as far as the same may consist with the general interest of the Union." XXV *Journals of the Continental Congress* 762–67 (Oct. 30, 1783), Ex. E3 X 116.

The second incident involving a jurisdictional conflict between a state and congress was New York's attempt to treat for land with the Six Nations before the national treaty. Unlike Pennsylvania, New York did not consult congress about its plans. Massachusetts had revived its claim to western New York. It had also managed to exclude New York representation from the Indian Commission. New York feared that the national treaty might jeopardize the state's interests. Rakove, Ex. E2, pp. 76–77, 82–83. It therefore attempted to negotiate a peace treaty with the Six Nations and to obtain cessions of their land before congress could organize the national treaty. New York planned to consolidate its claim by settling the disputed area. Onuf, Ex. 3, pp. 2, 22–23, 25–26.

Although New York's actions created considerable concern, congress did not forbid them. Instead, Arthur Lee and Richard Butler, Commissioners for Indian Affairs, invited New York to treat with the Indians at the national treaty out of "respect for the Confederation":

As the particular Nature of the Business your Excellency is to transact with the six Nations on the Part of this State, is not known to Us, We can not form a proper Judgment how far it is compatible with the Commission we have the honor to bear from the United States in Congress assembled. But We submit to your Excellency's Determination, whether that Business will not be more properly transacted at the same time with and in Subordination to the General Treaty. Such conduct on the Part of the State of Pennsylvania has been generally approved for its Wisdom and Confederal Policy. It is with a View that this State may have an Opportunity of shewing the same Respect for the Confederation and may avail itself of the same Advantages that We have the honor of communicating to your Excellency our Determination to meet the Indians of the six Nations at Fort Stanwix on the 20th of September next.

Letter of Arthur Lee and Richard Butler to New York Governor George Clinton (Aug. 19, 1784), *reprinted in* 1 *Proceedings of the Commissioners of Indian Affairs* 29, 30 (B. Hough ed. 1861), Ex. B X 30.

Both the Pennsylvania and New York's proposed land transactions could have directly interfered with congress' Article IX

cl. 1 power to make peace with the Six Nations. In fact, New York actually attempted to negotiate a "peace" treaty. However, the central government never questioned the states' ultimate right to purchase Indian land within their borders; it only questioned the states' timing. Moreover, congress' debates and responses suggest that congress did not believe that its authority was superior to the states' authority in this area. At most, congress was unsure of its power.

The Ordinance of 1786 also reveals the central government's deference to the states' legislative right. It established the Northern and Southern Indian districts and prohibited private persons from settling on Indian land or trading with the Indians located in the United States' territory. Congress amended the Ordinance to require the district superintendents to act "in conjunction with the Authority of (the) state" in all cases "where transactions with any nation or tribe of Indians, shall become necessary ... which cannot be done without interfering with the legislative rights of a state." Ordinance of 1786, XXXI *Journals of the Continental Congress* 490, 493 (Aug. 7, 1786), Ex. C X 47.

The central government's reactions to the Southern states' Indian problems is also revealing. Georgia and North Carolina did not cede their western land claims to the United States until 1802 and 1790, respectively. As noted above, both states interpreted the Articles of Confederation to preclude the central government from transacting any business with the Indians located within their state limits. *See* Letter of Benjamin Hawkins to Thomas Jefferson (June 14, 1786), *reprinted in* 9 *Papers of Thomas Jefferson* 640, 641 (J. Boyd ed.), Ex. 3 X 154; Rakove, Ex. E2, pp. 105–08. Consequently, both states renounced the Hopewell Treaties. They took land cessions from the Indians which created widespread hostility. The Southern Department's reports during the period contain some of the strongest language advocating that congress take total control over Indian affairs, including the right to extinguish Indian title within the states. However, congress generally ignored these suggestions. *See* XXXIII *Journals of the Continental Congress* 455, 455–63 (Aug. 3, 1787), Ex. E3 X 157 (defeating motion to consider Southern Committee's Aug. 3, 1787 report).[16] In fact, the central government's inability to deal effectively with Indian problems in the South lead to congress' plenary control over Indian affairs under the Constitution and the Nonintercourse Act.

There is little doubt that the Southern states were violating the peace treaties and the Articles of Confederation. *See* J. Madison "Vices of the Political System of the United States" (April, 1787), *reprinted in* 9 *Papers of James Madison* 348, Ex. C X 16. As Knox states, Georgia was essentially "engaging in war with the Indians." The situation in New York, however, was different. Georgia and North Carolina were taking cessions of Indian land and creating war with the Indians. New York's 1785 and 1788 treaties were purchases. Congress apparently had no objection to these treaties. Rakove, Tr. 781–82. If Article IX cl. 1 gave the central government power to prohibit the states from purchasing Indian land within their limits, it did so only where such purchases would directly jeopardize congress' "determinating on peace or war". The 1785 and 1788 treaties were conducted well after the peace treaty at Fort Stanwix had been concluded.

## I. *Proclamation of 1783*

■ Congress issued the Proclamation of 1783 on September 22, 1783. It provides:

Whereas by the ninth of the Articles of Confederation, it is among other things declared, that "the United States in Congress assembled have the sole and exclusive right and power of regulating the

---

**16.** Despite the Southern Committee's interpretation of congress' Indian authority, it recommended that congress persuade the Southern states to make land cessions to the United States rather than provoke a jurisdictional conflict.

trade, and managing all affairs with the Indians, not members of any of the states, provided that the legislative right of any State, within its own limits, be not infringed or violated." And whereas it is essential to the welfare and interest of the United States as well as necessary for the maintenance of harmony and friendship with the Indians, not members of any of the states, that all cause of quarrel or complaint between them and the United States, or any of them, should be removed and prevented: Therefore the United States in Congress assembled have thought proper to issue their proclamation, and they do hereby prohibit and forbid all persons from making settlements on lands inhabited or claimed by Indians, without the limits or jurisdiction of any particular State, and from purchasing or receiving any gift or cession of such lands or claims without the express authority and directions of the United States in Congress assembled.

And it is moreover declared, that every such purchase or settlement, gift or cession, not having the authority aforesaid, is null and void, and that no right or title will accrue in consequence of any such purchase, gift, cession or settlement.

XXV *Journals of the Continental Congress* 602 (Sept. 22, 1783), Ex. E3 X 89.

The Proclamation cites Article IX cl. 4 as its authority. Although it was designed to maintain "harmony and friendship with the Indians" and to remove "all cause of quarrel or complaint", the Proclamation of 1783 was not a "determination on peace and war" under Article IX cl. 1. The peace treaty would not come until 1784. The legislative history also reveals that congress omitted introductory language from the first draft which implied that congress was invoking its warmaking powers.[17] The final version substitutes the language from clause 4 in the first paragraph. Congress

thus intended to issue the Proclamation under its clause 4 powers. As discussed above, the legislative right proviso expressly retained the states' right to purchase Indian land within the states' limits. Accordingly, congress did not have authority in the Proclamation of 1783 to prohibit New York from purchasing plaintiffs' land located within New York State.

Moreover, congress never intended the Proclamation to prohibit instate land purchases. After the Treaty of Paris established peace with Great Britain, hostilities with the Indians continued. However, the central government took no significant action to establish peace with the Indians until it began receiving reports that settlers were moving onto lands intended for the national domain. Congress issued the Proclamation of 1783 almost immediately thereafter. Rakove, Ex. E 2, pp. 57–59.

The preliminary drafts specifically set a geographical limit on the Proclamation's jurisdiction. All persons were prohibited from "making settlements on land within the United States and without the boundaries of any particular State and from purchasing or receiving any gift or cession of such lands from the Indians." XXIV *Journals of the Continental Congress* 505, 505–06 (Aug. 13, 1783) Ex. E3 X 88. *See also* XXIV *Journals of the Continental Congress* 503 (Aug. 12, 1783) Ex. E3 X 87. However, Virginia's land cession was not completed. Congress had only approved the report recommending acceptance on September 13, 1783. As a result, the Proclamation was amended to prohibit purchases and settlements "without the limits or jurisdiction of any particular State" to ensure that congress would have jurisdiction over the western territory until the state cessions were complete. Rakove, Ex. E2, pp. 60–61.

---

**17.** The first draft's introductory paragraph which was eliminated provided:

Whereas it has been represented that sundry persons are preparing to settle upon lands within the U.S. which have not been purchased from the Indian nations by which proceedings the present frontier Inhabitants must be greatly endangered and the U.S. may be involved in War.

Be it ordained by the United States in Congress assembled and it is hereby ordained by the authority of the same. . . .

Congress therefore intended. the Proclamation of 1783 to apply only to land outside the states' boundaries, in what would be the national domain. *See* Virginia Delegates' Letter to Gov. Benjamin Harrison (Oct. 4, 1783), *reprinted in* 7 *Papers of James Madison,* 367, Ex. E3 X 90 (stating, "Congress had Issued a Proclamation prohibiting persons from Setling (sic) on Lands within the boundaries of the United States & out of the limits of any of them...."); Rhode Island Delegates to Gov. William Greene (Oct. 9, 1783), 7 *Letters of the Members of the Continental Congress* 326, Ex. 3 X 91 (stating, "A proclamation has issued from Congress prohibiting all persons from purchasing or accepting cessions of land from the Indians without the limits of the particular States..... And it is in contemplation to lay off a suitable district from the same for a new State to be disposed of to satisfy the public engagements to the army and to form a fund in aid of public credit."). Because the Proclamation of 1783 only applied to purchases outside the limits of the states, it did not prohibit New York's 1785 and 1788 purchases.

### J. *Treaty at Fort Stanwix*

█ The Treaty of Fort Stanwix was a peace treaty. It ended the War for Independence between the United States and the Six Nations Iroquois Confederacy. *See* Report to Congress of the Commission of Indian Affairs for the Northern and Middle Districts (Oct. 15, 1783), XXV *Journals of the Continental Congress* 680, 681–84, Ex. 1 X 32; Letter of George Washington to James Duane (Sept. 9, 1783), 27 *Writings of George Washington* at 134, 136, Ex. E3 X 94; Horseman, Tr. 988, 1062. The Treaty was thus a valid exercise of both congress' Article IX cl. 4 power to "manage all affairs with the Indians" and its Article IX cl. 1 power of "determining on peace and war".[18] As discussed above, however, neither clause gave congress the power to preclude New York State from purchasing Indian land within its borders.

Even if Article IX cl. 1 could be construed to give congress authority over state land purchases, the congressional delegates never intended the Fort Stanwix Treaty to preclude the states from purchasing Indian land within their recognized limits. The treaty's primary goal was to obtain a cession of western lands for the national domain. It was also intended to secure peace with the Six Nations so that the national domain could be settled. *See* Horsman, Tr. 994. The Treaty of Fort Stanwix was fashioned pursuant to George Washington's recommendations to James Duane in 1783, Philip Schuyler's July 29, 1783 letter to the President of Congress, and the Committee for Indian Affairs for the Northern and Middle Districts' report. *See* Letter of George Washington to James Duane (Sept. 9, 1783) *reprinted in* 27 *Writings of George Washington* 134, Ex. E3 X 94; Letter of Philip Schuyler to the President of Congress (July 27, 1783), *reprinted in* 3 *Papers of the Continental Congress* 601, Ex. C X 45; Report of the Committee for Indian Affairs for the Northern and Middle Districts (Oct. 15, 1783), XXV *Journals of the Continental Congress* 680 (Oct. 15, 1783), Ex. 1 X 32; Rakove, Ex. E2, pp. 62–63. They emphasized that peace was necessary to properly settle the national domain. They also recognized that peace could not be achieved without protecting the Indians' right to possess their land. However, the Indians were not supposed to retain possession indefinitely. Washington and Schuyler advised congress that the Indians would voluntarily leave their land as the white settlements increased and game became scarce. Accordingly, Washington, Schuyler, and the Committee advocated orderly acquisition of Indian land. Purchases by private persons, especially the land speculation companies, had to be prohibited. Washington recommended that only the central government and the states, within their respective limits, should be allowed to purchase the Indian's land. Letter of George Washington to

---

**18.** The parties' experts agree that the Fort Stanwix Treaty was a valid exercise of congress' power. Defendants' experts, however, contend that congress' authority came exclusively from Article IX cl. 4.

James Duane (Sept. 9, 1783), 27 *Writings of George Washington* at 137, Ex. E3 X 94.

When congress adopted the Commission's report it indicated that the proposed peace treaty would not infringe on the states' legislative rights. Congress resolved: "That the preceding measures of Congress relative to Indian affairs, shall not be construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits." XXV *Journals of the Continental Congress* at 693 (Oct. 15, 1783), Ex. 1 X 32. Congress also resolved to instruct its negotiating team to "reassure" the Oneida and Tuscaroras of their lands "until they may think it for their own advantage to dispose of the same." *Id.* at 687.

The congressional commissioners at Fort Stanwix also understood that they were supposed to reserve the Oneida and Tuscaroras' land until the Indians chose to sell their lands. Richard Butler, one of the commissioners, wrote in his notes that the commissioners were instructed "to reassure the Oneida & Tuscarora tribes of their favr (sic) & that they may rely on the lands which they claim will be reserved for their use & c (comfort) till they think fit to dispose of ym (them)." Richard Butler's Notes on the Treaty of Fort Stanwix (Oct. 18, 1784), *Richard Butler Papers,* 3 U *Lyman Draper Manuscripts* (State Historical Society of Wisconsin) 290, Ex. E2 X 45.

Finally, when congress accepted the Treaty of Fort Stanwix, it ordered that the treaty:

Be published and transmitted to the executives of the several states; and that it be declared, that no purchases, which have been or hereafter may be made from the Indians, at any treaties held or to be held with them, of their right to soil within the limits of any state, can, ought or shall be considered as interfering with the right of any such state to the jurisdiction or soil.

XXVIII *Journals of the Continental Congress* 426, 430 (June 3, 1785, June 6, 1785), Ex. E3 X 148. The New York delegation submitted the language reserving the states' legislative right. Because Massa-chusetts had revived its claim to western New York, New York considered the right to secure land within its borders extremely important. By transmitting the peace treaty with the above reservation, congress expressly reassured the states that it did not intend the Treaty of Fort Stanwix to affect the states' right to purchase Indian land within the states' limits.

## CONCLUSION

For the reasons discussed, the court finds that congress had neither the authority nor the intent to prohibit the states from purchasing Indian land located within their boundaries when the congress entered into the Treaty of Fort Stanwix in 1784 and issued the Proclamation of 1783. The land that New York purchased from the Oneidas in the 1785 and 1788 treaties was located within New York's recognized limits. Therefore, New York had the right to purchase the land in question, and the New York treaties did not violate either the Treaty of Fort Stanwix or the Proclamation of 1783.

Accordingly, plaintiffs' remaining claims based on the Articles of Confederation, the Proclamation of 1783 and the 1784 Treaty of Fort Stanwix fail to state a cause of action upon which relief can be granted and are dismissed.

IT IS SO ORDERED.